NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241353-U

NO. 4-24-1353

IN THE APPELLATE COURT

FILED
October 8, 2025
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| GREGORY JAMES, | ) | No. 23CF45 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer H. Bauknecht |
| | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Justices Lannerd and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed defendant's conviction of aggravated battery against a correctional officer, finding the trial court did not err in restricting testimony about a collateral incident involving another officer or that any such error was harmless, and defendant's claim of ineffective assistance of trial counsel could not be determined based on the record, and thus, should be brought in a collateral proceeding.

¶ 2    Defendant, Gregory James, appeals his conviction of aggravated battery (720 ILCS 5/12-3.05(d)(4)(i) (West 2020)) for striking Joshua Belter, a correctional offer, while Belter was engaged in the performance of his authorized duties. At trial, defendant sought to cross-examine the officer and introduce evidence suggesting the officer acted in retaliation based on an earlier incident involving a second officer, referred to in the record as "Officer Skinner," in which defendant alleged Skinner wrongly listened to a call between him and his attorney. The trial court allowed testimony that an incident with Skinner occurred but did not allow testimony about the

reason for it. Also at trial, defense counsel secured the appearance of another inmate, Jesse Herrera, via a writ. Herrera allegedly would provide exculpatory evidence. However, before trial, defendant told the court Herrera said he would not testify because the Illinois Department of Corrections (IDOC) offered to move Herrera to another prison in exchange for his silence. When called to testify, Herrera told the court he did not want to testify, and the court released him, as he was not present via a subpoena.

¶ 3        On appeal, defendant argues (1) the trial court denied him his constitutional right to confront the witnesses against him by restricting his cross-examination of Belter about the reason for the incident with Skinner, (2) the court erred in finding defendant's testimony about the reason for the incident with Skinner irrelevant, and (3) defense counsel rendered ineffective assistance by failing to subpoena Herrera.

¶ 4        We find the trial court did not err in restricting testimony about the incident involving Skinner or, assuming that error occurred, any such error was harmless. We also find defendant's claim of ineffective assistance of trial counsel cannot be determined based on the record before us, and thus, it should be brought in a collateral proceeding. Accordingly, we affirm.

¶ 5                                I. BACKGROUND

¶ 6        The State charged defendant with aggravated battery in connection with an incident between defendant and Belter in which Belter was injured and his glasses were broken. Defendant and Herrera were inmates at Pontiac Correctional Center (Pontiac) at the time, and Herrera allegedly witnessed the incident. The record indicates both defendant and Herrera had been transferred to Menard Correctional Center (Menard) at the time of trial. IDOC records show Herrera is now incarcerated at Centralia Correctional Center.

¶ 7        On June 11, 2024, the trial court held a one-day bench trial. Before the trial began,

defendant asked for the appointment of new counsel. During the court's inquiry into the request, the following colloquy occurred:

"THE DEFENDANT: *** I was just speaking with [Herrera] in the back. He blatantly told me flat out that IDOC offered, because we were housed two cells over from each other.

THE COURT: Well, I don't know anything about the facts of the case so I can't get into that.

THE DEFENDANT: Okay. I'm sorry.

THE COURT: I don't know. That's the purpose of today.

THE DEFENDANT: IDOC offered him a transfer to a different institution away from, if he doesn't testify today. So now he's telling me after a year that he's not going to because he wants his transfer and—

THE COURT: That's all hearsay. That's not evidence in front of me.

THE DEFENDANT: That's what I was asking [defense counsel] how do I make that evidence?

THE COURT: Well, hold on. Anything else? So you were sitting in holding having this conversation with this witness that you brought in?

THE DEFENDANT: Yep. And on the ride over here and in IDOC.

THE COURT: All right. [Defense counsel], do you generally want to respond in terms of your preparation and any evidence that [defendant] provided that you think is relevant or irrelevant?"

¶ 8    Defense counsel described the work she had performed on the case. Regarding Herrera, she stated:

"The last time I spoke to [Herrera], was last year. I tried to get another call with him this month. Menard is no longer allowing attorney calls with witnesses so it's going to be very challenging for me to continue to prepare a witness after my initial conversation with him."

The trial court denied defendant's request for new counsel.

¶ 9        Belter testified he was a correctional sergeant at Pontiac. On January 6, 2021, Belter received a report defendant had been belligerent and was aggravated with a female officer earlier in the day when coming back from the visiting room, and that activity was continuing. Belter went to defendant's cell with the plan to place defendant in mechanical restraints and move him to a cell with a solid door.

¶ 10       Belter told defendant he was going to be "cuff[ed] up" to move to a different cell because of the incident that happened earlier that day. Defendant refused to comply, was being belligerent, and said, "You'll have to get the tact[ical] team."

¶ 11       Belter testified he told staff to leave and they would have the tactical team come get defendant. Belter testified defendant "reached through the bars, slapped me, punched me in the side of the face, knocked my glasses off which in turn broke my glasses, grabbed the collar of my shirt at which point I grabbed his arm with my right hand, and I removed it away from my face." In the process, Belter's thumb was broken. The State entered into evidence photographs taken after the incident depicting Belter's face and broken glasses.

¶ 12       On cross-examination, the following colloquy occurred:

"Q. Do you recall that the female officer was Officer Skinner that you referred to earlier?

A. I couldn't remember which female officer it was. I just know it was a

- 4 -

female officer.

Q. And you indicated that my client was coming from a visiting call?

A. It was either like a visit or something in the ad min [*sic*] building, but he was being escorted back. I can't remember the exact details.

Q. Is it possible it was an attorney call he had with someone else regarding a separate issue?

A. It could have been.

Q. Okay. And were you aware that Miss Skinner had to be told to leave that room because she was overhearing a confidential conversation?

A. I was not.

[STATE'S ATTORNEY]: Objection. Relevance.

THE COURT: What's the relevance?

[DEFENSE COUNSEL]: Your Honor, the witness has testified that my client's behavior is what drove him having to be removed; and I would like to flesh out a different version of what actually happened regarding why he had to be moved.

THE COURT: How is that relevant?

[DEFENSE COUNSEL]: It's going to be part of the defense argument that the prosecution's witnesses are biased based upon that incident that happened earlier.

THE COURT: Well, if, well, any counter argument or rebuttal?

[STATE'S ATTORNEY]: Well, I mean, if that's the case, this is not the proper witness to pursue that. There's been nothing stated by this witness that he

was aware of that type of particularity. He was simply responding from the State's perspective in that line of questioning for how he ended up at that cell. There was no attempt by the State to delve into the details of that incident nor has it been shown that he was aware of those details or that if he did he would know, or that he would know in an admissible way.

THE COURT: All right. At this point, I'm sustaining the objection; but when you get to your case in chief, I will allow you some leeway if you need to recall the witness if he has the information that you are asking; but it doesn't appear that he actually does."

¶ 13 Cross-examination then continued, as follows:

"[DEFENSE COUNSEL]: *** Can you explain to me a second time then why [defendant] was being, had to change cells?

A. Because I was notified that he got belligerent and was being resistant with a female officer. When I came back into the cellhouse because I was dealing with another issue, I was told this; and that's when I talked to my lieutenant; and we decided we were going to move him behind a door.

Q. Okay. That's all I needed to know.

And did you actually talk to this female officer?

A. I'm sure I did at some point that day, ma'am."

¶ 14 Daniel A. Tovrea testified he was working as a correctional officer at Pontiac at the time of the incident and witnessed what occurred. Tovrea testified defendant was uncooperative and, when the decision was made to call the tactical team, defendant instantly reached through the bars and hit Belter in the face several times, knocking off his glasses. Defendant also tried to grab

Belter's uniform. On cross-examination, Tovrea testified he did not know or did not remember why defendant was being moved. The State then rested.

¶ 15 Defense counsel told the trial court she would try to call Herrera as a witness "and see what he says." The following colloquy then occurred:

"THE COURT: *** All right. I'm going to swear you in to testify, if you can raise your right hand to the best of your ability.

[HERRERA]: I'm not going to testify.

THE COURT: Oh, you don't want to testify?

[HERRERA]: (Shakes head.)

THE COURT: Well, you are here under oath, sir. Or excuse me. Is he here by subpoena?

[DEFENSE COUNSEL]: He's just here by a writ.

THE COURT: By a writ. And you don't wish to testify today, sir?

[HERRERA]: No, ma'am.

THE COURT: Okay. Then you can take him back out."

¶ 16 Defense counsel took a few minutes to discuss with defendant whether he would testify. When they returned, the trial court sought clarification as to where defendant had spoken with Herrera that day. It was clarified defendant and Herrera were initially in a "holding cell facility" together while being shackled for transport and then they were in two holding cells at the courthouse.

¶ 17 At the beginning of defendant's testimony concerning the incident, the following colloquy occurred:

"Q. And prior to the alleged incident, did you have an opportunity to have

a phone call with someone earlier in the day?

A. Yes, ma'am.

Q. And was it with an attorney?

A. Yes, ma'am.

Q. Were you allowed to have a private conversation with that attorney?

A. No, ma'am.

Q. What happened?

[STATE'S ATTORNEY]: Objection. Relevance.

THE COURT: What's the relevance?

[DEFENSE COUNSEL]: Your Honor, again the relevance is my client has a different version of what happened that led to him getting back to his cell.

[STATE'S ATTORNEY]: I guess it's more towards the materiality of this. It's not material, therefore it's not relevant. The State has no burden to prove the motive. It doesn't matter why he has any certain demeanor that he has.

[DEFENSE COUNSEL]: Your Honor, if I may.

THE COURT: Um-hum.

[DEFENSE COUNSEL]: The defense version of what happened here is that my client was attacked by the staff, and we need to lead up to the point on why that is what he believes happened versus that he was not cooperative when they arrived at his cell. So I think the facts and circumstances leading up to that incident is very relevant.

THE COURT: Well, I don't believe it's relevant. I am sustaining the objection. He can testify to what happened at the cell, whether as you are indicating

he believes that the officer was the aggressor versus the Defendant being the aggressor; but why someone did that is not relevant.

[DEFENSE COUNSEL]: Your Honor, what about the fact that they are saying that the purpose for him, why he was being moved was fabricated? The Court does not believe that that's relevant either?

THE COURT: It doesn't matter why he was being moved. It's not an element to be proven, and it doesn't have anything to do with the charges. It doesn't matter. They could have been moving him for any reason at all or not moving him. That's not a relevant factor.

[DEFENSE COUNSEL]: Okay."

¶ 18 Defendant testified that, after he finished his call, Skinner escorted him back to his cell. When asked what his behavior was as he returned, he said, "Content, happy because I had just settled on a lawsuit so I was happy. I was in a great mood."

¶ 19 Defendant said he was back at his cell and talking with Herrera "about the lawsuit and what was going on," when Belter arrived. According to defendant, Belter cursed at him. When asked what happened next, defendant further testified,

"Um, Sergeant Belter then, you know, cuff the F up now. Cuff up now. I began to try to plead with him and ask him like what's going on. Then I told him like, you know, I'm not cuffing up because I believed that he had him, his boy there to defend he setting the female officer out for being in the legal, being, listening in on a legal call. So that's why I believe he was there, they were there.

So when he told me to cuff up, I made it clear that I wasn't cuffing up until the tact[ical] team came with the camera."

There was no objection from the State. Defendant testified he wanted to wait for the tactical team because they would have cameras and said, "That way the regular officers can't beat you, can't jump on you is what we do as inmates." Defendant said he knew Belter was not going to treat him fairly.

¶ 20    Defendant said he spoke to another officer who was present, Officer Adam Greenway, who talked him into cuffing up. According to defendant, he placed his arms behind his back through a chuckhole for the cuffs and Belter grabbed and twisted his wrist. Defendant demonstrated the motion for the trial court. He testified, "[I]t's a tactic that they use when they are upset with you and want to get you. They take your wrists, and they bend you so that way the front of your body goes forward and your arms is, you know." Defendant said it felt like Belter was going to break his wrist. Defendant pulled his arms back into the cell and refused to cooperate after that. Defendant was not aware of how Belter's glasses were broken but indicated it happened during the scuffle.

¶ 21    Defendant testified the tactical team came and removed him from the cell. He was transferred to Menard after that. There was no video of the incident. Defendant also testified Tovrea was not present during the incident.

¶ 22    The State recalled Belter, who said both Greenway and Tovrea were present during the incident. Belter denied cursing or yelling at defendant. Defense counsel asked Belter, "[I]sn't it true you were upset with my client because of treatment to Officer Skinner?" Belter responded, "Was I upset with him? No. I didn't get upset with him until after he struck me." In closing argument, defense counsel argued Belter knew defendant's behavior earlier in the day was the reason why defendant was being moved and that defendant's testimony was more credible.

¶ 23    The trial court found defendant guilty. In doing so, the court stated, "Well,

obviously this case boils down to credibility." The court noted there were two different stories, but the State had a corroborating witness and photographs. The court also found it was more plausible Betler's injuries occurred by defendant facing forward.

¶ 24 The trial court set the matter for sentencing on August 20, 2024. Defense counsel asked, "Can you show it for post-trial motion as well?" The court responded, "Yes." On August 20, 20204, defense counsel filed a motion for a new trial, arguing, in part, the court erred by not allowing the admission of relevant testimony.

¶ 25 At the August 20, 2024, hearing, defense counsel and the State argued the posttrial motion. The State did not object to the late filing of the motion. The trial court denied the motion. The court then held the sentencing hearing and sentenced defendant to 10 years' incarceration, to be served consecutive to the sentence defendant was already serving.

¶ 26 This appeal followed.

¶ 27 II. ANALYSIS

¶ 28 On appeal, defendant argues (1) the trial court denied him his constitutional right to confront the witnesses against him by restricting his cross-examination of Belter about the reason for the incident with Skinner, (2) the court erred in finding defendant's testimony about the reason for the incident with Skinner irrelevant, and (3) defense counsel rendered ineffective assistance by failing to subpoena Herrera.

¶ 29 A. Forfeiture

¶ 30 At the outset, we note the State argues defendant forfeited the issues raised on appeal because his motion for a new trial was untimely filed.

¶ 31 Normally, a written motion for a new trial shall be filed by the defendant within 30 days following the entry of a finding or the return of a verdict. 725 ILCS 5/116-1(b) (West 2024).

However, there is no jurisdictional bar to a trial court entertaining a posttrial motion that was not timely filed within 30 days but was filed before the imposition of the sentence. *People v. Talach*, 114 Ill. App. 3d 813, 818 (1983). Further, the rules of forfeiture also apply to the State. *People v. Bridgeforth*, 2017 IL App (1st) 143637, ¶ 46. This court has described the doctrine of forfeiture "as a two-way street." *People v. Gauwitz*, 80 Ill. App. 3d 362, 367 (1980). Thus, when the State does not move to strike an untimely posttrial motion but instead participates in arguments on the substantive merits of the motion, the State forfeits any objection to the motion's untimeliness. *Id.*

¶ 32        Here, the trial court ruled on the motion before sentencing. The State never objected to the untimely motion and participated in arguments concerning the substance of the motion. Accordingly, the State forfeited any argument concerning the timeliness of the motion.

¶ 33                                B. Cross-Examination

¶ 34        Defendant first argues the trial court erred in finding the reason for the incident with Skinner was irrelevant and in limiting cross-examination of Belter on the matter. In particular, defendant contends the court denied him his constitutional right to confront the witnesses against him. Defendant maintains the evidence was relevant to show bias on the part of Belter and to prove defendant's theory that Belter acted in retaliation for the incident with Skinner.

¶ 35        Defendant did not specifically invoke the confrontation clause at trial or in his motion for a new trial. However, he did preserve his argument concerning relevance and generally argued the trial court erred in excluding the evidence and by limiting cross-examination on a topic he contended would show bias on the part of Belter. Further, while the State argues defendant failed to make a sufficient offer of proof, it does not contend defendant inadequately framed the issue at trial or in his motion for a new trial as a confrontation-clause issue. Thus, the State forfeited any forfeiture argument on that basis. Accordingly, we address the merits of the issue.

¶ 36    Both the federal and state constitutions vest defendants with the right to cross-examine witnesses against them to reveal biases, prejudices, or a motive to testify falsely. U.S. Const., amend. VI, XIV; Ill. Const. 1970, art. I, § 8; *People v. Gonzalez*, 104 Ill. 2d 332, 337 (1984). "[S]howing bias, interest, or motive to testify is an accepted method of impeachment." *People v. Triplett*, 108 Ill. 2d 463, 475 (1985). Bias describes the "relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party." *United States v. Abel*, 469 U.S. 45, 52 (1984). Bias may be induced by a witness's dislike of a party or by the witness's self-interest, and proof of bias is almost always relevant because the finder of fact and weigher of credibility has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness's testimony. *Id.*

¶ 37    However, "[i]t is well established that a trial judge retains wide latitude insofar as the confrontation clause is concerned to impose reasonable limits on such cross-examination based on concerns about harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or of little relevance." *People v. Harris*, 123 Ill. 2d 113, 144 (1988) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986)). "[B]ut this discretionary authority arises only after the court has permitted sufficient cross-examination to satisfy the confrontation clause." *People v. Blue*, 205 Ill. 2d 1, 13 (2001). "That is, the court should afford a defendant the widest latitude to establish the witness' bias or hostile motivation." *Id.* at 14. A defendant states a confrontation clause violation " 'by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness.' " *Id.* (quoting *Van Arsdall*, 475 U.S. at 680). "The latitude allowed on cross-examination is within the sound discretion of the circuit court, and a reviewing court will not interfere unless there has been a clear abuse of discretion resulting in manifest prejudice to the defendant." *People*

*v. Kirchner*, 194 Ill. 2d 502, 536 (2000).

¶ 38    We first note that we are hesitant to find the reason for the incident between defendant and Skinner was wholly irrelevant. The topic would provide context to the issue of Belter's alleged bias, and, without it, the trier of fact could be left with the impression defendant had no basis for his disagreement with Skinner, which in turn could harm defendant's own credibility. Regardless, we find the trial court did not err in restricting cross-examination on the topic, or to the extent error occurred, it was harmless.

¶ 39    While we find the evidence relevant, we find it was minimally relevant. More important was that Skinner had been involved in an earlier incident with defendant, which defendant alleged gave Belter cause to retaliate against defendant. The trial court did not limit cross-examination on the fact that an incident with Skinner occurred. Only the reason for the incident with Skinner was restricted.

¶ 40    Next, although the trial court later found the reason for the disagreement with Skinner irrelevant, the record shows the court did not restrict defendant's cross-examination based solely on a lack relevance. Instead, after Belter testified he was unaware Skinner had to be told to leave the room because she was overhearing a confidential conversation, the court heard argument on the objection, and the State essentially noted foundational issues with the question when Belter did not appear to have knowledge of the reason for the incident with Skinner. The court sustained the objection, noting Belter did not appear to have the information defendant sought to elicit on cross-examination.

¶ 41    Evidence that a witness had a motive to lie is not relevant if it is remote or uncertain because it must give rise to the inference that the witness had something to gain or lose by his or her testimony. *People v. Johnson*, 2018 IL App (1st) 140725, ¶ 91. Evidence used to establish a

motive to lie must therefore be "timely, unequivocal and directly related." *People v. Sims*, 192 Ill. 2d 592, 625 (2000). It " 'must not be 'remote or uncertain.' " *Id.* (quoting *Triplett*, 108 Ill. 2d at 476).

¶ 42        Here, the record shows there would be no value to further cross-examination of Belter about the reason for the incident with Skinner because when Belter said he was unaware of the reason for the incident with Skinner, any motivation for Belter to lie based on that was remote and uncertain. On that basis, we find the trial court did not err in restricting the testimony. Further, even if we were to find error, it was harmless.

¶ 43        "Although a denial of the right of effective cross-examination has been labeled a 'constitutional error of the first magnitude,' " it is nevertheless subject to harmless error review. *Blue*, 205 Ill. 2d at 14 (quoting *Brookhart v. Janis*, 384 U.S. 1, 3 (1966)).

> " 'The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.' " *Id.* (quoting *Van Arsdall*, 475 U.S. at 684).

¶ 44        Here, as already noted, the evidence was minimally relevant, and Belter testified he had no knowledge of the reason for the incident. Then, during defendant's testimony, defendant

testified without objection from the State that he did not agree to "cuff up" because he believed Belter was there to defend defendant "setting the female officer out for being in the legal, being, listening in on a legal call." Thus, the trial court nevertheless heard evidence of the reason for the incident with Skinner, making the evidence cumulative. While defendant contends he was prevented from presenting his theory of the case, he was not restricted from testifying an incident with Skinner occurred that motivated Belter to act in retaliation, and counsel argued in closing that Belter knew why defendant was being moved.

¶ 45                    C. Defendant's Testimony

¶ 46         Defendant next argues the trial court erred in restricting his own testimony about the incident with Skinner.

¶ 47         As previously discussed, we find evidence of the reason for the incident between defendant and Skinner relevant, but minimally so. In regard to defendant's direct testimony, we determine the trial court's finding that the evidence was irrelevant was harmless.

¶ 48         "Where relevant evidence that was denied admission is purely cumulative, the result is harmless error and will not require a reversal and remand for a new trial." *People v. Garza*, 92 Ill. App. 3d 723, 737 (1981). As previously discussed, despite the finding the evidence was irrelevant, defendant later testified without objection from the State that he did not agree to "cuff up" because he believed Belter was there to defend defendant "setting the female officer out for being in the legal, being, listening in on a legal call." Thus, the evidence, which was already minimally relevant, was also cumulative. We further note counsel did not make an offer of proof to show that defendant would have testified to additional relevant facts beyond the basic reason for the incident with Skinner that the trial court heard without objection from the State. We cannot speculate as to whether additional relevant details would have been presented. See *People v. Bauer*,

393 Ill. App. 3d 414, 424 (2009) (citing *People v. Jones*, 121 Ill. App. 2d 268, 273 (1970)).

¶ 49                                      D. Failure to Subpoena Herrera

¶ 50            Finally, defendant argues ineffective assistance of counsel based on counsel's

failure to issue a subpoena to Herrera.

¶ 51            Claims of ineffective assistance of counsel are evaluated under the two-pronged

test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). The defendant must show counsel's

performance fell below an objective standard of reasonableness and the deficient performance

prejudiced the defendant. *Id.* at 687-88. To show prejudice, a defendant must show there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different. *Id.* at 694. "[A] 'reasonable probability' is defined as a showing

sufficient to undermine confidence in the outcome, rendering the result unreliable or

fundamentally unfair." *People v. Patterson*, 2014 IL 115102, ¶ 81. The failure to establish either

prong of the *Strickland* test is fatal to a defendant's claim. *People v. Ceja*, 204 Ill. 2d 332, 358

(2003). The likelihood of prejudice is especially notable in cases where the evidence amounted to

a case of "he said/she said" because the outcome of the case then depended on the jury's credibility

determinations. See *People v. Valentine*, 299 Ill. App. 3d 1, 4 (1998). In such a case, there is a

reasonable probability the error affected the outcome of the trial. See *id.* at 5.

¶ 52            Normally, the failure to subpoena witnesses known to defense counsel who would

contradict the State's case or provide exonerating testimony demonstrates ineffective assistance of

counsel. *People v. Makiel*, 358 Ill. App. 3d 102, 106 (2005); *People v. Butcher*, 240 Ill. App. 3d

507, 510 (1992). Even if deemed strategic, counsel's decisions "may be deemed ineffective when

they result in the failure to present exculpatory evidence of which counsel was aware, including

the failure to call witnesses whose testimony would support an otherwise uncorroborated defense."

*People v. Soto*, 2025 IL App (1st) 231001-U, ¶ 32. However, "counsel's failure to call a witness whose testimony would not have exonerated the defendant does not support a claim of ineffective assistance." *People v. Costic*, 2025 IL App (4th) 241041-U, ¶ 66. Whether counsel's failure to investigate and call witnesses prejudiced the defendant is determined by the value of the evidence that was not presented at trial and the closeness of the evidence that was presented. *Makiel*, 358 Ill. App. 3d at 107.

¶ 53        Here, the record is clear defense counsel had previously spoken to Herrera and wanted him to testify but failed to issue a subpoena. As a result, when Herrera stated he did not wish to testify, the trial court excused him rather than attempt to compel him to testify. Thus, the failure of counsel to issue a subpoena suggests deficient representation. However, while "defendants are required to raise ineffective assistance of counsel claims on direct review if apparent on the record," such claims are "better suited to collateral proceedings *** when the record is incomplete or inadequate for resolving the claim" on direct appeal. *People v. Veach*, 2017 IL 120649, ¶ 46. That is the case here because the record is inadequate for us to make a full determination of the matter and whether defendant suffered prejudice.

¶ 54        Given that Herrera was excused, the record lacks information as to what he might have testified to if the trial court had attempted to compel him to do so. We know from the record that counsel spoke with Herrera and had reason to want him to testify on behalf of defendant. We also know defendant told the court Herrera said he would not testify because IDOC offered him a move to a different prison if he refrained from giving testimony. We also note Herrera is currently located in a different prison. We may take judicial notice of that fact. *People v. Parker*, 2025 IL App (4th) 241253-U, ¶ 15. However, we can only speculate as to why Herrera was actually moved, how Herrera would testify if brought to court under a subpoena, and what the strength of his

testimony would be.

¶ 55 For example, it is unknown if Herrera directly witnessed the events at issue or would have directly corroborated defendant's testimony. It is also unknown whether he would have testified at all, even if threatened with contempt. Given the closeness of the case, which consisted of a "he said/she said" scenario, and in which the trial court specifically noted and gave significant weight to the fact Belter's testimony was corroborated when defendant's was not, we can image a situation in which, if Herrera was a direct eyewitness and credibly corroborated defendant's testimony, there would be a reasonable probability the testimony of Herrera as a corroborating witness would have raised a reasonable doubt respecting guilt, and thus, the failure to present him was failure to render effective representation. See *Butcher*, 240 Ill. App. 3d at 510. But we can only speculate here as to whether Herrera would be a sufficiently corroborating witness.

¶ 56 In addition, if Herrera refused to testify under subpoena, that could open the door for defendant to provide evidence Herrera was offered a move to another prison in exchange for declining to testify. That, too, could have a meaningful impact on defendant's case, as the implication would be Herrera's testimony would be damaging to the State's case. But again, at this juncture, that is purely speculative.

¶ 57 Thus, we cannot determine whether counsel rendered ineffective assistance based on the record before us. In a collateral proceeding, such as a postconviction proceeding, defendant would be able to provide affidavits and evidence if warranted to support his claim of ineffective assistance. Thus, a proper record could be made. See *People v. Bew*, 228 Ill. 2d 122, 134 (2008). As resolution of this issue depends on facts not in the record, we find a collateral proceeding is a more suitable mechanism for addressing defendant's ineffective assistance of counsel claim.

Accordingly, we affirm.

¶ 58                                    III. CONCLUSION

¶ 59            For the reasons stated, the judgment of the trial court is affirmed.

¶ 60            Affirmed.